Todd D. Gardner (#5953)
BATEMAN, GOODWIN & GARDNER
4120 South Highland Drive, Suite 100
Salt Lake City, Utah 84124
Telephone: (801) 424-3451
Facsimile: (801) 424-3429
Attorney for the Plaintiffs

William D. Marler (admission *pro hac vice* pending)
Denis Stearns (admission *pro hac vice* pending)
MARLER CLARK, LLP PS
701 First Avenue, Suite 6600
Seattle, WA 98104
Tel. (206) 346-1888
Fax (206) 346-1898
Attorneys for Plaintiff

FILED
U.S. DISTRICT COURT

2008 MAY -6  A 11: 56

DISTRICT OF UTAH

BY:_____
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| WEYLIN and MEGAN RICHARDS, husband and wife,<br><br>            Plaintiffs,<br>v.<br><br>WENDY'S INTERNATIONAL, INC., a foreign corporation;<br><br>            Defendants. | COMPLAINT<br><br>Case: 1:08cv00046<br>Assigned To : Campbell, Tena<br>Assign. Date : 5/6/2008<br>Description: Richards v. Wendys International<br><br>JURY DEMAND |

The plaintiffs, Weylin and Megan Richards, by way of Complaint against the defendants say:

**PARTIES, JURISDICTION, AND VENUE**

1.1     The plaintiffs, Weylin and Megan Richards, are husband and wife, and at all material times have resided in Cache County, Utah.

1.2     Defendant Wendy's International Inc. (Wendy's), is a foreign corporation, authorized to do business in Utah. Wendy's International Inc. owns and/or operates the Wendy's restaurant located at 2500 N. 400 E., Ogden, Utah.

1.4     This Court has jurisdiction over the subject matter of this action pursuant to 28 USC §1332(a) because the matter in controversy exceeds $75,000.00, exclusive of costs, and because this action is one between citizens of different States.

1.5     Venue in the present judicial district is proper pursuant to 28 USC §1391 (a)(2) because a substantial portion of the events giving rise to the plaintiffs' claims occurred here, and because the defendant was subject to personal jurisdiction at the time this action was commenced.

## FACTS

### *E. coli* O121:H19 and HUS

2.1.1   *Escherichia coli* is the name of a common family of bacteria, most members of which do not cause human disease. *E. coli* O121:H19 bacteria, unlike the vast majority of *E. coli* family members, is pathogenic. Specifically, *E. coli* O121:H19 produces shiga toxin (Stx) which can cause painful, bloody diarrhea (hemorrhagic colitis) in humans.

2.1.2   After someone ingests a sufficient quantity of *E. coli* O121:H19 (also known as the infectious dose), Stx attaches to cells lining blood vessels on the inside surface of the large intestine and other organs and initiates an inflammatory reaction. The result is the bloody diarrhea and abdominal cramps characteristic of an infection with shiga toxin-producing *E. coli*.

2.1.3   A wide spectrum of disease is possible as a result of an *E. coli* O121:H19

infection, from mild, non-bloody diarrhea, to severe diarrhea that is grossly bloody and accompanied by intense abdominal pain.

2.1.4 While the acute symptoms usually resolve without complications within seven to ten days, with further convalescence taking up to several weeks, an *E. coli* O121:H19 infection can also develop into hemolytic uremic syndrome ("HUS"), a life-threatening condition for which there is no cure.

2.1.5 About five to ten percent of individuals infected with Stx-producing *E. coli* develop HUS. HUS was first described in 1955, and today is recognized as the most common cause of acute kidney failure in children.

2.1.6 HUS develops when the Stx from the bacteria, enters the circulation through the inflamed bowel wall. Stx, and most likely other chemical mediators, attach to receptors on the inside surface of blood vessel cells (endothelial cells) and initiate a chemical cascade that results in the formation of tiny thrombi (blood clots) within these vessels. Some organs seem more susceptible, perhaps due to the presence of increased numbers of receptors, and include the kidney, pancreas, and brain. By definition, when fully expressed, HUS presents with the triad of hemolytic anemia (destruction of red blood cells), thrombocytopenia (low platelet count), and acute renal failure (loss of the filter function of the kidney).

2.1.7 Endothelial damage to the kidneys is followed by the depositing of fibrin strands in blood vessels, which mechanically damages the red blood cells as they traverse the partially obstructed capillary membrane. This hemolysis produces an abrupt and profound hemolytic anemia.

2.1.8 Thrombocytopenia, an abnormal decrease in the number of blood platelets,

occurs as a result of platelet destruction, increased consumption, sequestration in the liver and spleen, or aggregation of platelets in the kidney. The platelets can also be seen adhering to the wall of the capillary membranes in the kidneys. This causes swelling and occlusion, reduced renal blood flow, and a decline in renal filter function.

2.1.9  The kidneys are largely bundles of tiny blood vessels. Acute filtration of the blood occurs in the glomerulii. As a result of HUS, glomerular injury and glomerular death may occur. Once dead, the filtering units of the kidneys do not regenerate.

2.1.10  The active stage of HUS may be defined as that period of time during which there is evidence of hemolysis and the platelet count is less than 100,000. In HUS, the active stage usually lasts an average of six days (range, 2-16 days). It is during the active stage that the complications of HUS usually occur.

2.1.11  The most important aspect of the treatment of patients with HUS remains excellent supportive care, which includes: close observation in a tertiary-care facility; meticulous attention to fluid, electrolyte, and metabolic balance; optimal nutrition; and careful blood pressure control. Blood transfusions may be necessary several times during the course of the active stage. Dialysis or interventional therapy, such as plasma exchange (plasmapheresis), may be necessary for patients at risk for a bad outcome.

2.1.12  There is no known therapy to halt the progression of HUS. The active stage of the disease usually lasts one to two weeks during which a variety of complications are possible. HUS is a potentially life-threatening condition that even in the best American medical centers has a mortality rate of three to five percent. Among survivors, about five percent will eventually develop end stage renal disease (ESRD) with a resulting need for dialysis or even transplantation. Other long-term problems include

the risk for hypertension, proteinuria (abnormal amounts of protein in the urine that reflect renal injury), and reduced kidney filtration rate.

### The *E. coli* O121:H19 Outbreak

2.2.1   In early August 2006, public health officials in Weber County, Utah, became aware of several people who attended a teachers' conference luncheon and had contracted *E. coli* O121:H19 infections.

2.2.2   Health officials concluded that the source of the infection was contaminated iceberg lettuce prepared at the Wendy's Restaurant at 2500 North 400 East in North Ogden, Utah.  One of the patients with confirmed HUS, who had not attended the teacher's conference, had eaten cheeseburgers with iceberg lettuce at the Wendy's Restaurant during the outbreak period. The second confirmed HUS case was an attendee of the teachers' conference, and a third case of HUS was determined to be secondary transmission from an infected person at the conference.

2.2.3   Eventually, officials determined that at least 69 people had become ill in the outbreak.
One of the HUS patients with *E. coli* O121:H19 was laboratory confirmed by stool culture.  DNA subtyping by Pulsed Field Gel Electrophoresis (PFGE) showed that one of the individuals that was not associated with the conference, but who had consumed cheeseburgers from Wendy's during the outbreak period, was an identical genetic match to one of the previous confirmed *E. coli* cases associated with Wendy's.

2.2.4   The method of preparation of the iceberg lettuce employed by Wendy's was a direct and proximate cause of the amplification of contamination of the lettuce with *E. coli* O121:H19, and therefore the illnesses associated with the outbreak.

2.2.5   The manner of mixing and cutting the lettuce employed by Wendy's resulted in broader contamination of the lettuce's inner leaves thus amplifying contamination of the product.

2.2.6   Wendy's previously had an outbreak of *E. coli* O157:H7 traced to contamination of lettuce in one of its restaurants. In 2000, health department officials in Oregon traced an outbreak of E. coli O157:H7 to cross-contamination from ground beef to lettuce at a Wendy's restaurant in Salem, Oregon.

**Prior Pathogenic *E. coli* Outbreak at Wendy's**

2.3.1   The August 2006 outbreak that occurred at the Wendy's restaurant located at 2500 N. 400 E. in North Ogden, Utah was not the first outbreak of pathogenic *E. coli* to occur at one of the defendant's restaurants. Another such outbreak occurred in August 2000 at a Wendy's restaurant owned by Wendy's International Inc. and located in Salem, Oregon.

2.3.2   Marion County (Oregon) Health investigators contacted the Oregon Health Department on August 22, 2000 to report that a number of County residents were suffering from *E. coli* O157:H7. Like *E. coli* O121:H19, *E. coli* O157:H7 is a pathogenic strain in the family of *Escherichia coli* bacteria; *E. coli* O157:H7 is the most common strain of pathogenic *E. coli*.

2.3.3   Approximately three days later, Wendy's International, Inc voluntarily closed its restaurant located in Salem Oregon. Marion County Health Department officials ultimately found that cross-contamination, from ground beef to lettuce, was the likely cause of the outbreak, which sickened at least 17 people.

**Megan Richard's *E. coli* O121:H19 Infection**

2.4.1    On or about June 30, 2006, Megan Richards consumed a salad prepared and purchased at the Wendy's restaurant located at 2500 N. 400 E. in North Ogden, Utah.

2.4.2    Megan Richards subsequently developed an *E. coli* O121:H19 infection. As a result of her infection, Megan was hospitalized from July 6 through July 27, 2006. While hospitalized, Megan Richards developed HUS. As a result of her *E. coli* O121:H19 infection and subsequent HUS, Megan Richards has suffered permanent and severe injuries.

### FIRST CAUSE OF ACTION - STRICT LIABILITY CLAIMS

3.1    The plaintiffs incorporate paragraphs 1.1 through 2.4.2 of this Complaint by this reference, as if each and every one of these paragraphs was set forth here in its entirety.

3.2    The defendant manufactured, marketed, distributed and/or sold the adulterated food that injured the plaintiffs.

3.3    Because the food that Megan Richards consumed was adulterated, not fit for human consumption, not reasonably safe in design and construction, lacked adequate warnings and instructions, and was unsafe to an extent beyond that contemplated by the ordinary consumer, the defendant is strictly liable to the plaintiffs for the harm proximately caused by its manufacture and sale of an unsafe and defective product.

### SECOND CAUSE OF ACTION - NEGLIGENCE

4.1    The plaintiffs incorporate paragraphs 1.1 through 3.3 of this Complaint by this reference, as if each and every one of these paragraphs was set forth here in its entirety.

4.2    The defendant owed a duty to the plaintiffs to manufacture and sell food

that was not adulterated, that was fit for human consumption, that was reasonably safe in construction, and that was free of pathogenic bacteria or other substances injurious to human health. The defendant's duty included the safe handling and processing of all foods it sold to the public. The defendant breached this duty.

4.3     The defendant owed a duty to the plaintiffs to select, audit, monitor, test, and ensure that all constituent food growers provided food that was pathogen free. The defendant breached this duty.

4.4     Plaintiffs' injuries and damages were proximately caused by defendant's negligence. Accordingly, defendant is liable to plaintiffs for their damages.

### THIRD CAUSE OF ACTION - NEGLIGENCE PER SE

5.1     The plaintiffs incorporate paragraphs 1.1 through 4.4 of this Complaint by this reference, as if each and every one of these paragraphs was set forth here in its entirety.

5.2     The defendant had a duty to comply with all statutory and regulatory provisions that pertained or applied to the manufacture, distribution, storage, labeling and sale of the food it sold, including the applicable provisions of the Federal Food, Drug and Cosmetic Act, the Federal Meat Inspection Act, and Utah Food Regulations, all of which prohibit the manufacture and sale of any food that is "adulterated," or otherwise "injurious to health."

5.3     The food that the defendant manufactured, distributed and sold, and that Megan Richards consumed, was "adulterated" within the meaning of the federal Food, Drug and Cosmetic Act, the Federal Meat Inspection Act, and Utah Food Regulations, because the food contained a substance that rendered it injurious to health.

5.4 The defendant violated federal, state, and/or local food safety regulations by its manufacture and sale of adulterated food.

5.5 The defendant violated state and local food safety regulations by operating in accordance with standards and procedures that were insufficient, unsafe, and inconsistent with applicable food and safety regulations.

5.6 The federal, state, and/or local food safety regulations applicable here, establish a positive and definite standard of care in the design, manufacture, and sale of food, and the violation of these regulations constitutes negligence per se.

5.7 The plaintiffs were injured as the direct and proximate result of the defendant's violation of applicable federal, state, and local food safety regulations. Accordingly defendant is liable to plaintiffs for their damages.

## FOURTH CAUSE OF ACTION - BREACH OF WARRANTIES

6.1 The plaintiffs incorporate paragraphs 1.1 through 5.7 of this Complaint by this reference, as if each and every one of these paragraphs was set forth in its entirety.

6.2 The defendant is subject to liability to plaintiffs for breach of express and implied warranties made to plaintiffs with respect to the product sold to plaintiffs, including the implied warranties of merchantability and of fitness for a particular use. Specifically, the defendant warranted, through its sale of food to the public, and by the statements and conduct of its employees and agents, that the food it prepared and sold was fit for human consumption, and not otherwise adulterated or injurious to health.

6.3 The plaintiffs allege that food consumed was contaminated with *E. coli* O121:H19, and related filth and adulteration, would not pass without exception in trade, and was thus in breach of the implied warranty of merchantability.

6.4     The plaintiffs allege that the food consumed was not fit for the uses and purposes intended, i.e., human consumption, and that this product was therefore in breach of the implied warranty of fitness for its intended use.

6.5     The plaintiffs' injuries and damages were proximately caused by defendant's breach of this implied warranty. Accordingly, defendant is liable to plaintiffs for their damages.

### PUNITIVE DAMAGES

7.1     The plaintiffs incorporate paragraphs 1.1 through 6.5 of this Complaint by this reference, as if each and every one of these paragraphs was set forth in its entirety.

7.2     The defendant is subject to punitive damages to plaintiffs as a result of conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of plaintiffs. The defendant failed to prevent contamination of lettuce in its store with pathogenic *E. coli* despite one or more prior occurrences of such contamination at its stores.

### DAMAGES

8.1     The plaintiffs, Weylin and Megan Richards, have suffered damages as the direct result of the defendant's tortious and unlawful acts and omissions, including, without limitation, past and future damages for the loss of enjoyment of life, pain and suffering, mental anxiety and stress, permanent physical injury, and any damages for which the law provides relief.

8.2     The plaintiffs have also suffered special, incidental and consequential damages as the direct and proximate result of the defendant's unlawful acts and omissions, including, without limitation, past and future damages for medical-related

expenses, travel-related expenses, and any damages for which the law provides relief.

8.3 The plaintiff Weylin Richards has suffered a loss of consortium due to the severe and permanent injuries to his wife Megan Richards.

WHEREFORE, the plaintiffs demand:

(1) That the Court award plaintiffs judgment against defendant for all general, special, incidental and consequential damages incurred, or to be incurred; and

(2) That the Court award plaintiffs their costs, disbursements and reasonable attorneys' fees incurred; and

(3) That the Court award pre- and post judgment interest; and

(4) Punitive Damages; and

(5) That the Court award such other and further relief as it deems necessary and proper.

DATED 5/6, 2008

BATEMAN, GOODWIN & GARDNER

Todd D. Gardner, Esq.
Attorney for Plaintiffs

MARLER CLARK, L.L.P., P.S.

William D. Marler, Esq., P.S.
Attorney for Plaintiffs
701 Fifth Avenue, 6600
Seattle, WA 98104
Tele No. (206) 346-1888
(application to appear pro hac vice pending)